IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| BRYON YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-0651-CV-W-HFS |
| | ) | |
| TIME WARNER CABLE CAPITAL, L.P., | ) | |
| d/b/a TIME WARNER CABLE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Bryon Young filed this suit against his former employer, Time Warner Cable.[1] His

complaint alleges that Time Warner (1) subjected him to a racially hostile work environment, (2)

discriminated against him based on race in failing to promote him, (3) retaliated against him for

making an internal complaint of discrimination by suspending and terminating him, and (4) engaged

in a pattern or practice of discrimination,[2] all in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 1981 and the Missouri Human Rights Act. Time Warner has filed a motion for

summary judgment. Each side has filed a motion to strike certain evidence relied upon by the

opponent. For the reasons set forth below, Time Warner's motion for summary judgment will be

---

[1]Three related entities are named as defendants: Time Warner Cable Capital, L.P., d/b/a
Time Warner Cable; TWC Holdings, LLC, d/b/a Time Warner Cable; and KCCP Trust, d/b/a
Time Warner Cable. In this order, the court will refer to these defendants collectively as "Time
Warner."

[2]Although not set out as a separate claim, plaintiff's complaint does allege that Time
Warner engaged in a pattern or practice of discrimination. Compl. ¶ 21.

granted in part and denied in part. Plaintiff's motion to strike will be denied; Time Warner's motion to strike will be granted in part and denied in part.

## I.    Summary Judgment Standards

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 467 (1962). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party, and it must give that party the benefit of all reasonable inferences to be drawn from the evidence. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Luigino's, Inc. v. Stouffer Corp., 170 F.3d 827, 830 (8th Cir. 1999).

A party seeking summary judgment bears the initial burden of demonstrating to the court that an essential element of the non-moving party's case is lacking. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden then shifts to the non-moving party to come forward with sufficient evidence to demonstrate that there is a factual controversy as to that element, or to explain why such evidence is not currently available. Id.; Fed. R. Civ. P. 56(e). In resisting summary judgment, the non-moving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); 10B Charles Alan Wright et al., Federal Practice and Procedure §§ 2739, 2727 (3d ed. 1998). In other words, the non-movant must do more than merely assert that there is a genuine issue

of material fact. With these principles in mind, the court turns to an analysis of Time Warner's motion.

## II. Background

Plaintiff Bryon Young, an African-American, began his employment with Time Warner in Kansas City in 1997 as an installer.[3] Shortly thereafter, plaintiff became a service/maintenance technician for Time Warner. Service technicians work on the aerial drops and receivers and address in-house problems; maintenance technicians work on the hard lines, the cable that runs from pole to pole. When serving as a service technician, plaintiff's supervisor was Tom Blanchan. When serving as a maintenance technician, plaintiff's supervisor was Martin Carlson. Plaintiff worked four days a week, Wednesday through Saturday, from 7 a.m. to 7 p.m.[4]

On August 17, 2002, a Friday, plaintiff was at Time Warner's Olive location to pick up his paycheck. As he was walking through the lunchroom, he saw Martin Carlson and said "Hi." Then, according to plaintiff, Carlson said, "If I had any pups out of you, I would take them out and drown them. And by the way, nice tan." Plf. Depo. 93:7-10. At the time of the incident, Carlson was not plaintiff's supervisor.[5] On Wednesday, August 21, 2002, plaintiff's next regularly scheduled work day, plaintiff reported the incident with Carlson to Tom Blanchan, plaintiff's supervisor. Plaintiff's conversation with Blanchan took place after a regularly scheduled morning Tech meeting. Plaintiff

---

[3]Plaintiff had worked for Time Warner in Milwaukee, Wisconsin between 1991 and 1997 as an installer and cable service technician.

[4]Time Warner sets forth various instances of citations and discipline regarding plaintiff occurring in 1998 and 1999. See Time Warner's SOF ¶¶ 20-32. These incidents do not appear to have a significant connection to plaintiff's claims or Time Warner's defenses or explanations, so they will not be discussed in detail.

[5]Carlson testified that he had not been plaintiff's supervisor since 1998 or 1999. Carlson Depo. 46:14-24. However, he was still a supervisor at the time.

3

told Blanchan what Carlson had said, and according to plaintiff, Blanchan was concerned and looked puzzled and hysterical. Within five minutes of his conversation with plaintiff, Blanchan reported the incident to his manager, Frank Baker. Baker spoke with plaintiff and asked him to write down what Carlson said word-for-word, and plaintiff did so.[6] Baker then contacted Carlson's manager, Fieldon Webster, and told him that there was a complaint. Within 30 minutes of speaking to plaintiff, Baker contacted Human Resources. Baker and Blanchan informed Regina Henson, Employee Relations Manager in Human Resources, that plaintiff had a complaint about an incident involving Mr. Carlson. Henson was in charge of investigating complaints. On August 21 or 22, 2002, Webster and Baker spoke with Carlson about the incident and told him of the remarks plaintiff had reported. Carlson testified that he admitted to Webster and Baker that he had made the "nice tan" comment, but he denied that he had made any comment regarding "pups" or drowning them. Carlson Depo. 36:12-24.[7]

On August 22, 2002, plaintiff called Henson. During the call, Henson looked in Carlson's file and found the note regarding the incident that plaintiff had written at Baker's instruction. Henson told plaintiff that she would contact him later to discuss the incident. The next morning, August 23, 2002, plaintiff met with Henson and Baker for about 30 minutes, discussing the incident. Henson and Baker told plaintiff they were sorry and that the situation would be investigated. Henson told plaintiff that to investigate further, he needed to submit a formal complaint. Time

---

[6]With regard to Carlson's comment, plaintiff testified that Baker "couldn't believe that [Carlson] said it to me." Plf.'s Depo. 94:17-18. Plaintiff asserts that Baker did not believe him, while Time Warner contends that Baker merely could not believe that Carlson made such a comment.

[7]In its position statement to the Kansas City Human Relations Department, Time Warner stated that "Carlson admitted that he had said to Young something like 'If I were you I would will my offspring,' and 'nice tan.'" Plf.'s Ex. 6 at 2.

4

Warner's internal complaint procedure requires a signed and dated written complaint. Also on August 23, 2002, Henson met with Carlson to discuss the incident; Carlson told her he never made any comment to plaintiff about "pups" or drowning them. On August 26, 2002, plaintiff submitted a formal complaint stating that on August 17, 2002, Martin Carlson told him: "If I had pups out of you I would take them out and drown them. Oh, by the way, 'Nice Tan.'" TW Ex. V.

Within a week after August 23, 2002, Carlson went out into the field to speak to plaintiff. Carlson testified that he apologized to plaintiff and that they hugged. Plaintiff testified that no apology or hug took place; instead, Carlson said, "I thought we had a friendship. I thought we had a relationship," and plaintiff replied, "No, we never had a relationship." Plaintiff testified that he felt threatened by Mr. Carlson's presence that day.

As a result of plaintiff's complaint, Carlson received a verbal warning and counseling. According to Time Warner, based in part on plaintiff's complaint against Carlson, Steve Bennett, Director of Field Operations, moved Carlson to another department, Quality Control; Bennett testified that it was not a demotion. Plaintiff notes that Carlson received a pay increase in the months following plaintiff's complaint, but Carlson testified that all employees received annual pay increases for cost of living as long as they were competent and had not been written up. Carlson Depo. 54:13-25. At the close of the investigation, Henson met with plaintiff to discuss her findings and review what had happened. According to plaintiff, Henson told him that Carlson had no previous write-ups and that the investigation was completed. Plaintiff testified that he was not satisfied with the investigation, but at the time, he did not express his dissatisfaction or ask Henson or anyone else in Human Resources or management at Time Warner to investigate the matter further.

On September 20, 2002, a Job Requisition Form was posted for the position of Online Technical Supervisor. Plaintiff applied for the position on October 17, 2002.[8] Baker signed off on plaintiff's application, indicating that plaintiff had not received a written warning or been placed on an employee improvement plan within the previous 90 days. The Online Technical Supervisor manages field personnel in the installation and maintenance of online services. Requirements of the position included a high school diploma or equivalent and electronic or cable television courses; A+ certification was also strongly preferred. Plaintiff does not have a high school diploma or GED. Plaintiff had, however, taken A+ training courses; he also had taken college courses and certain cable classes through Time Warner. Plaintiff does not have any education or experience in managing or supervising people.

Eric Weeden, supervisor of online services, encouraged plaintiff to apply for the Online Technical Supervisor job. Mike Coleman was the department manager responsible for making the hiring decision. Plaintiff testified that Coleman told him Steve Bennett instructed him to hold off on plaintiff's interview; plaintiff was not given an explanation.[9] Plaintiff claims no one ever communicated anything further to him about his application. He was not interviewed or selected for the position. Plaintiff was one of eleven individuals who applied for the position. He testified that he does not know any of the other applicants and does not know the gender, race or ethnicity of those individuals. Further, plaintiff does not know who (if anyone) was ever interviewed for the position, whether anyone was ever hired for the position, or what that person's qualifications were.

---

[8]Plaintiff's affidavit states that he applied for the position "to transfer away from Martin Carlson." Plf.'s Aff. ¶ 60.

[9]The record before the court does not contain any testimony from Coleman or Bennett on this point.

According to Time Warner, the position was eliminated, so no one was ever hired. In October 2002, Robert Moel became President of Time Warner in Kansas City, and he began a company reorganization, which lasted until mid-2003. Moel Affidavit (TW Ex. AA). As part of the reorganization, Moel eliminated several positions, including the Online Technical Supervisor position. Due to the closing of several positions and the reorganization, no one was or has been hired for the position of Online Technical Supervisor.[10]

In early December 2002, Frank Baker received a billing statement indicating that one of his employees had ordered Pay-Per-View adult-themed movies on the employee's "hot box." The bill was issued under account number 524817. A hot box is a cable box issued by Time Warner to its technicians solely for the purpose of troubleshooting customer problems. The hot box is authorized to receive any type of service offered by Time Warner. Each hot box has a unique number embedded on it. It is a violation of company policy to order adult-themed movies on a hot box when an employee is off duty. Further, absent a service call regarding problems with adult-themed movies, it is a violation of company policy to order such movies on a hot box.

When Baker noticed the unauthorized charges on the billing statement (TW Ex. BB), he accessed Time Warner's computerized billing system and pulled up the billing records for account number 524817. Using the system, Baker looked up each of the adult-themed movies to confirm the dates and times they were ordered and to find out on which hot box they were ordered.[11] The computerized billing system contains hot box information, while billing statements do not. The hot

---

[10]Plaintiff has filed a motion to strike Moel's affidavit, arguing that Moel was not previously identified by Time Warner in discovery.

[11]A total of eight movies were ordered, seven on November 21, 2002 and one on November 30, 2002. TW Ex. DD. The movies spanned two billing statements (one issued after plaintiff was terminated), but all eight appeared in the computerized billing system when Baker initially pulled up the account after receiving the first billing statement.

7

box accounts have multiple outlets on each account. Each outlet has a different hot box serial number attached to it, which is in turn assigned to a specific technician. What is ordered on the hot boxes is tracked through the outlet to which each hot box is assigned.

In the computerized billing system records, under each of the eight adult-themed movies ordered is the phrase "outlets= 5." TW Ex. DD. Baker testified that the phrase indicated that the movies were ordered by outlet 5. The serial number identified with outlet 5 on the computerized billing system was PIUA352EC. Baker's clerk, Walt Westwood, maintained a Modem/Hot Box List that uses hot box numbers to track which employees used particular hot boxes and/or test equipment, by serial number, within the Field Operations Department; it also reflects account numbers and outlets. TW Ex. CC. Westwood generated the Modem/Hot Box List in 2000 and hand-keyed the information into the document. Baker took the serial number PIUA352EC to Westwood and asked him to check the Modem/Hot Box List to determine which employee had the hot box with that serial number. Westwood determined that Tech 780, Bryon Young, had been assigned hot box number PIUA352EC. Baker and Westwood did not look at the account number when cross-referencing the hot box on which the adult-themed movies were ordered. On the Modem/Hot Box List, plaintiff's account number is listed as 524818. Time Warner asserts that the List contains two inaccuracies: (1) Westwood mistyped plaintiff's account number, which should have been 524817; and (2) the List reflects L. Fasani (another technician on account 524817) as assigned to outlet 5, when in fact he was assigned to outlet 4. Time Warner maintains that the computerized billing system, from which the hot box serial number was ascertained, does not contain errors.

Plaintiff asserts that "outlets=5" on the computerized billing system indicates that there are a total of five outlets, not that outlet 5 ordered the movies. In his affidavit, plaintiff states that the information contained in the computerized billing system records (TW Ex. DD) is referred to by

8

cable technicians as "cable data" information, and that cable technicians regularly view "cable data" in the course of performing disconnection services. The "cable data" is used to indicate how many cable boxes or outlets the technician needed to collect and what outstanding balances were collectible from the customer. Plaintiff performed more than 1,000 disconnections. Based on his experience, the phrase "outlets=5" would indicate that a particular residence or account had five outlets (or cable boxes) that needed to be collected.[12]

After concluding that plaintiff was the employee that ordered the adult-themed movies on his hot box, Baker contacted Geri Watts, Vice President of Human Resources. He told Watts that he had conducted an audit of a billing statement he received and discovered the improperly ordered movies. On December 4, 2002, Baker met with plaintiff. Plaintiff testified that his conversation with Baker started in the hallway, when Baker asked him if he had ordered any pay-per-view movies while he was on vacation. Plaintiff replied "no," believing Baker was asking about his home cable account. Then Baker asked if plaintiff's brother (who lives with plaintiff) might have ordered pay-per-view movies, to which plaintiff replied "maybe," again thinking Baker was asking his home cable account. Once in the meeting room, Baker showed him the billing statement and asked him if his brother ordered the movies shown; plaintiff says he realized that Baker was now asking about whether his brother used plaintiff's hot box to order the movies. Plaintiff answered, "No. No. No way." Then Baker asked him a question about the identity of his hot box, to which plaintiff answered "yes." According to plaintiff, at that point, Watts entered the meeting. Plf.'s Depo. 202:16-207:2.

_____

[12]Time Warner has filed a motion to strike this portion of plaintiff's affidavit (paragraphs 12 through 18, 21 and 22), arguing that it contradicts his deposition testimony and lacks foundation.

Watts[13] was present during this meeting, acting as a facilitator.[14] Watts Depo. 29:16-30:2, 31:25-32:10. During the meeting, Watts took notes. Watts' notes indicate that plaintiff told Baker that his brother may have ordered the movies; then plaintiff said it was not his brother; then plaintiff said it was his brother. TW Ex. FF. Plaintiff maintains that once he realized that Baker was asking whether his brother had ordered the movies on plaintiff's hot box (as opposed to his home cable account), he consistently answered no. At no point did plaintiff admit that he ordered the movies in question on his hot box. Baker told plaintiff that he wanted to be fair and wanted to make sure the hot box in question was plaintiff's hot box, so he asked plaintiff to go out to his work truck and get his hot box. Plaintiff responded that he did not have the hot box with him.[15] Because it was unclear whether plaintiff possessed the hot box in question, Baker decided to suspend plaintiff pending investigation. Plaintiff was given the opportunity to talk with a person at "next level up," which was Steve Bennett (Baker's boss). Watts called Bennett, who then came to the meeting. Watts continued to take notes. Plaintiff stated his case to Bennett. Bennett reviewed the billing statement; he also reviewed the computerized billing system printouts, from which he concluded that

---

[13]There is deposition testimony from another lawsuit that in the year 2000 or 2001, Watts had commented to Nicholas Williams, a Time Warner HR employee, that "We shouldn't hire any more Tamikas or Ikas." Williams Depo. 21:12-22:8 (Plf.'s Ex. 15). Williams also testified that during a time when Time Warner was hiring a significant number of minorities, Watts commented to Williams that the company should stop hiring "trash." Williams Depo. 23:22-24:21. Plaintiff in this case, Bryon Young, did not hear or have knowledge of Watts making any such comments. Time Warner argues that Williams' testimony should be stricken.

[14]Plaintiff argues that Watts played an active role in his termination. As discussed later in this section, Time Warner contends that Frank Bennett was the only one with the authority to terminate plaintiff's employment.

[15]Plaintiff's affidavit states that Time Warner management instructed technicians to remove all equipment from their vans and keep it inside their homes to prevent theft. On the morning of December 4, 2002, plaintiff left without the equipment because he was concerned about getting to the weekly meeting on time. He planned to go home and get the equipment before going to his first service call.

10

the adult-themed movies were ordered through outlet 5. Bennett found that plaintiff's hot box, number PIUA352EC, was assigned to outlet 5 on the computerized billing system.

Return of company-issued tools and equipment is required upon suspension. At the time plaintiff was suspended, he had to return home to get his hot box to turn it in to Time Warner. When plaintiff brought in his hot box, the serial number on it matched the serial number on the box that Baker and Bennett concluded had ordered the adult-themed movies on November 21 and 30, 2002. Based on this evidence, Bennett made the decision to terminate plaintiff on December 5, 2002. Plaintiff's employment with Time Warner was terminated because Bennett believed plaintiff had ordered the movies on this hot box, which is considered theft of service and misuse of company equipment.[16] Watts called plaintiff and conveyed the termination decision. Plf.'s Depo. 202:5-7.

Bennett and Baker testified that Bennett was the only person who had the authority to terminate plaintiff. Bennett Depo. 115:10-12; Baker Depo. 52:3-6, 67:20-22. Plaintiff asserts that Watts took part in the decision to terminate him – she was present at the meeting, took "pro-company" notes, and ultimately informed plaintiff by phone that he was terminated. Time Warner disputes this. Watts did not terminate plaintiff and did not have the authority to do so; she did not approve the termination of plaintiff and did not have authority to approve the termination of plaintiff. Henson Depo. 24:8-13; Watts Depo. 126:14-19. Watts' function at the meeting was as a facilitator or mediator.[17] Baker Depo. 53:20-54:6; Watts Depo. 63:22-64:4, 71:24-72:8. The Time

_____

[16]Time Warner's termination letter to plaintiff, signed by Bennett, cited "unauthorized use of company equipment, specifically for ordering X-rated pay-per-views on test equipment." Plf.'s Ex. 23.

[17]Bennett testified that Human Resources is involved in the discipline and/or termination process to ensure that discipline is consistently applied. Bennett Depo. 96:9-23.

Warner Human Resources Department does not have the authority to terminate, suspend or discipline an employee. Bennett Depo. 114:11-19.

On January 23, 2003, plaintiff jointly filed a charge of discrimination with the Kansas City, Missouri Human Relations Department and the Equal Employment Opportunity Commission. TW Ex. II. It alleges discrimination on the basis of race and retaliation. Allegations in the administrative charge form the basis for plaintiff's hostile work environment, failure to promote and retaliation claims. On April 27, 2004, the EEOC issued plaintiff a Notice of Right to Sue. Then, on July 27, 2004, plaintiff filed this action.

## III.    Motions to Strike

### A.        Plaintiff's Motion to Strike

Plaintiff requests that the court strike the affidavit Robert Moel (TW Ex. AA) due to Time Warner's failure to disclose this witness in its initial or any supplemental disclosures.[18] The Moel affidavit essentially states that after Moel became President of Time Warner in Kansas City in October 2002, he began a reorganization; as part of the reorganization, the position of Online Technical Supervisor (for which plaintiff applied in October 2002) was eliminated and no one was ever hired. Plaintiff argues that failure to disclose Moel as a witness is highly prejudicial to his failure to promote claim. In response, Time Warner argues that the failure to disclose Moel did not result in prejudice or unfair surprise to plaintiff. Time Warner notes that Moel and his position in the company were discussed in the depositions of plaintiff, Watts and Bennett. Bennett testified that no one was hired for the Online Technical Supervisor job. And in one of plaintiff's own exhibits (Plf.'s Ex. 14), Bennett apparently informed an EEOC investigator that no one received the position

---

[18]Plaintiff withdrew his request to strike the affidavit of Cynthia Hines (TW Ex. LL) when Time Warner indicated that it was only offered to lay a foundation for company documents.

Case 4:04-cv-00651-HFS    Document 77    Filed 08/01/06    Page 12 of 31

because the "new division president froze all hiring." In light of this evidence, that court finds that plaintiff has not been prejudiced or unfairly surprised by Moel's affidavit, and there was no evidence of bad faith in Time Warner's nondisclosure. Bergfeld v. Unimin Corp., 319 F.3d 350, 354-55 (8th Cir. 2003) (stating that the "use of an undisclosed witness should seldom be barred unless bad faith is involved."). Therefore, plaintiff's motion to strike will be denied.

### B. Time Warner's Motion to Strike

Time Warner requests that the court strike various exhibits and facts. First, Time Warner argues that the portion of plaintiff's affidavit (Plf.'s Ex. 3, ¶¶ 12-18, 20-21) that involves his experience interpreting the computerized billing system records (TW Ex. DD) should be stricken because it contradicts plaintiff's deposition testimony and lacks foundation. While plaintiff did testify that he had not seen a bill that looked like Ex. DD before, he also testified that he had received similar billing information when acting as a disconnection tech. Plaintiff's affidavit states that he viewed and interpreted "cable data" information, like that contained in Ex. DD, in the course of performing disconnection services. He also states that he performed more than 1,000 disconnections. The court concludes that the affidavit elaborates on, and does not contradict, his deposition testimony. Further, plaintiff's personal knowledge and experience with disconnections provides a foundation for his affidavit.[19] The affidavit portions in question will not be stricken.

Next, Time Warner argues that interview notes taken by Paul Pierce, EEOC investigator (Plf.'s Exs. 14, 16 and 22), should be stricken because they constitute inadmissible hearsay within hearsay and no exception applies to either level of hearsay. Plaintiff first responds that "factual findings" are admissible under Fed. R. Evid. 803(8)(C). Bassett v. City of Minneapolis, 211 F.3d 1097, 1104 n.12 (8th Cir. 2000). Although the Eighth Circuit has not addressed whether an EEOC

---

[19]The court does not find a foundational problem with paragraph 43 either.

investigator's interview notes constitute "factual findings" or "administrative findings" under Rule 803(8)(C), a recent district court opinion concluded they did not. <u>Stolarczyk ex rel. Estate of Stolarczyk v. Senator Int'l Freight Forwarding, LLC</u>, 376 F. Supp. 2d 834, 838-40 (N.D. Ill. 2005) (finding notes were "just shorthand notes of statements" offered for the truth of the matter, and therefore hearsay). While the <u>Stolarczyk</u> case is most directly on point, Time Warner's additional case citations also support that conclusion. <u>See</u> TW's Motion at 6. The court concludes that Rule 803(8)(C) does not apply to the interview notes.

Alternatively, plaintiff asserts that the statements made to Pierce are admissible as party-opponent admissions (Fed. R. Evid. 801(d)(2)), and that Pierce (whom plaintiff listed as a witness) could take the stand to testify as to what he was told, thereby alleviating the hearsay problem. However, portions of the interview notes also contain double hearsay, that is, the person being interviewed by Pierce telling Pierce what a third party told him. For example, in one interview, Bennett told Pierce that "[c]omplainant later admitted ordering the movies." Plf.'s Ex. 14 at 5. Plaintiff has not advanced a cure for such instances of double hearsay. Because some portions of the interview notes may be admissible while others are not, it is impossible for the court to make a blanket ruling on the admissibility of the notes. Thus, the court will not strike the interview notes at this time.

Time Warner also asks the court to strike the affidavits of five former Time Warner employees (Plf.'s Exs. 9-13). The affidavits were executed in November 2001 for use in another case and assert allegations of discriminatory treatment of African-American employees. Plaintiff does not know these employees and did not work with them; they worked in other departments and they were not managed by Baker, Bennett or Carlson. Time Warner argues that because plaintiff's pattern or practice claim fails, affidavits of these other employees should not be considered by the

14

court. Without such a claim, Time Warner argues that consideration of the affidavits would be unduly prejudicial. Plaintiff responds that the affidavits constitute "background information" for his claims and cites <u>Henderson v. Ford Motor Co.</u>, 403 F.3d 1026, 1037 (8th Cir. 2005). In <u>Henderson</u>, though, the "background information" the court referred to was information about the plaintiff's <u>own</u> employment history with the defendant, <u>not</u> about other employees. As discussed below, the court will grant summary judgment on plaintiff's pattern or practice claim. Given that ruling and the lack of any connection of the five former employees to this case, the court will strike the affidavits because they are unduly prejudicial and irrelevant to the claims in this case.

In addition, Time Warner requests that the court strike deposition testimony of Nicholas Williams in another case (Plf.'s Ex. 15) that Watts commented to him that the company should stop hiring "Tamikas or Ikas" and "trash." Plaintiff did not hear or have knowledge of Watts' comments. Time Warner argues because plaintiff's pattern or practice claim fails and because Watts was not the decision-maker in plaintiff's termination, Williams' testimony should be stricken. At this time, the court is not inclined to strike Williams' testimony.

Time Warner also wants the court to strike EEO-1 reports from 1995 through 2000 (Plf.'s Ex. 27), which show race, sex and other data about Time Warner employees in various categories. Plaintiff asserts that the reports show "an institutional reluctance" by Time Warner to promote African-American employees, and that they are relevant to his failure to promote claim. Time Warner argues for exclusion based on the failure of plaintiff's pattern or practice claim. In addition, it contends that EEO-1 reports only reflect data for managers, and plaintiff applied for a supervisor position. At this time, the court is not convinced that the reports should be stricken.

Finally, Time Warner asks that the court strike certain of plaintiff's responses to its Statement of Uncontroverted Material Facts (33, 109, 118, 120, 121, 122, 128, 131, 132, 135, 137,

150, 152, 161, 165, 180). Time Warner argues that plaintiff's responses are either not supported by the record or lack citation to the record. After reviewing the responses in question, the court finds that plaintiff substantially complied with Local Rule 56.1(a), so the responses will not be stricken.

## IV.    Analysis

### A.    Pattern or Practice Claim

As noted, plaintiff's complaint alleges a claim for pattern or practice discrimination, specifically, that "the defendants have engaged in a pattern and practice of terminating the employment of black employees for improper reasons, and for reasons for which similarly situated white employees would not be terminated." Compl. ¶ 21. Time Warner argues that plaintiff failed to allege a pattern or practice discrimination claim in his Charge of Discrimination and therefore should be barred from pursuing such a claim in this case. In his opposition brief, plaintiff does not respond to this argument at all.

Before filing suit under Title VII or the MHRA, plaintiffs must first exhaust their administrative remedies. Duncan v. Delta Consol. Indus., Inc., 371 F.3d 1020, 1024-25 (8th Cir. 2004) (Title VII); Tart v. Hill Behan Lumber Co., 31 F.3d 668, 671 (8th Cir. 1994) (MHRA). Administrative remedies are deemed exhausted as to all incidents of discrimination that are "'like or reasonably related to the allegations of the [administrative] charge.'" Tart, 31 F.3d at 671 (quoting Anderson v. Block, 807 F.2d 145, 148 (8th Cir. 1986)). So "the sweep of any subsequent judicial complaint may be as broad as the scope of the [administrative] 'investigation which could reasonably be expected to grow out of the charge of discrimination.'" Cobb v. Stringer, 850 F.2d 356, 359 (8th Cir. 1988) (citation omitted). Allegations outside the scope of the administrative

charge, however, circumscribe the agency's investigatory and conciliatory role, and for that reason are not allowed. Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 223 (8th Cir. 1994).

Although the Eighth Circuit has not ruled on the exhaustion of pattern or practice claims, various district courts have barred plaintiffs from pursing a pattern or practice claim in court when such a claim was not alleged in the administrative charge. See, e.g., Kasali v. J.P. Morgan/Chase Manhattan Mortgage Corp., No. Civ.A04-500, 2004 WL 2252118, at *1 n.1 (E.D. Pa. Sept. 28, 2004); Richane v. Fairport Cent. Sch. Dist., 179 F. Supp. 2d 81, 92 n.6 (W.D.N.Y. 2001); Richardson-Longmire v. Kansas, No. CIV. A. 97-2679-KHV, 1999 WL 156168, at *7 (D. Kan. Mar. 8, 1999); Anyaibe v. Gilbert Security Serv., Inc., No. Civ. A. No. 94-2377, 1995 WL 322452, at *5 (D.D.C. May 18, 1995).

In the present case, plaintiff's administrative charge deals solely with allegations of discrimination occurring to plaintiff himself, including the comments from Carlson, his application for the Online Technical Supervisor position, and his subsequent suspension and termination. It does not contain any allegations that reference or mention pattern or practice discrimination, or even hint at discrimination of any kind occurring to anyone but plaintiff. Even giving the charge the most liberal and expansive reading, it cannot be said that a claim for pattern or practice discrimination is "like or reasonably related to" the charge's allegations regarding discrimination occurring to one

person, plaintiff.[20]  Because plaintiff has failed to exhaust his administrative remedies, any pattern

or practice claim under Title VII or the MHRA is barred and must be dismissed.[21]

### B.    Hostile Work Environment

Plaintiff alleges that he was subjected to a racially hostile work environment.  To prevail on

a hostile work environment claim based on the conduct of a supervisor, a plaintiff must prove that

(1) he is a member of a protected class, (2) unwelcome harassment has occurred, (3) there is a causal

nexus between the alleged harassment and his protected group status, and (4) that the harassment

affected a term, condition or privilege of employment.[22]  LeGrand v. Area Res. for Cmty. & Human

Servs., 394 F.3d 1098, 1101 (8th Cir. 2005).[23]  The fourth factor has both objective and subjective

components.  Williams v. Missouri Dept. of Mental Health, 407 F.3d 972, 975 (8th Cir. 2005).

---

[20]In arriving at the same conclusion, the Anyaibe court explained: "Everything in the plaintiff's administrative charge related to personal discrimination against him; nothing addressed any harassment, retaliation, discrimination or other improper activities aimed at other [company] employees.  Since a pattern or practice claim, by definition, would involve more than one employee's allegations of discrimination, the EEOC investigation would not have focused on a pattern or practice without some indication that such discrimination was at issue."  Anyaibe, at *5.

[21]Time Warner also argues that to the extent plaintiff is asserting a pattern or practice claim under Section 1981, such a claim should be dismissed because plaintiff has not come forth with statistical or anecdotal evidence sufficient to establish that Time Warner engaged in a pattern or practice of discrimination.  Morgan v. United Parcel Serv. of America, 380 F.3d 459, 466 (8th Cir. 2004).  Plaintiff's opposition brief does not even attempt to respond to this argument, so no further analysis is necessary.  Any pattern or practice claim under Section 1981 is also dismissed.

[22]When the alleged harassment is perpetrated by non-supervisory employees, a plaintiff also must prove a fifth element – that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action.  Bradley v. Widnall, 232 F.3d 626, 631 n.5 (8th Cir. 2000).

[23]Hostile work environment claims under Title VII, Section 1981 and the MHRA are governed by the same analysis and standards.  See LeGrand, 394 F.3d at 1101; Richmond v. Bd. of Regents of Univ. of Minn., 957 F.2d 595, 598 (8th Cir. 1992).

18

Specifically, the harassment must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the employee must subjectively believe that his working conditions have been altered. Henthorn v. Capitol Communications, Inc., 359 F.3d 1021, 1026 (8th Cir. 2004) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993)).

The Supreme Court has held that the standards for judging workplace hostility must be demanding enough so as to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes and occasional teasing." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotes omitted). To determine whether the conduct at issue is sufficiently severe or pervasive, the court must look to the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Duncan v. General Motors Corp., 300 F.3d 928, 934 (8th Cir. 2002) (quoting Harris, 510 U.S. at 23). Ultimately, a plaintiff must show that the harassing conduct "was so intimidating, offensive, or hostile that it 'poisoned the work environment.'" Scusa v. Nestle U.S.A. Co., Inc., 181 F.3d 958, 967 (8th Cir. 1999).

Here, the court will assume arguendo that plaintiff has satisfied the first three elements of a hostile work environment claim and focus on the fourth element, whether the harassment affected a term, condition or privilege of plaintiff's employment. Plaintiff asserts that he has established this element with the following: (1) Carlson's August 17, 2002 comment "If I had any pups out of you I would take them out and drown them. And by the way, nice tan."; (2) Watts' alleged comments about not hiring "Tamikas or Ikas" and "trash"; (3) plaintiff's allegation that Time Warner treated plaintiff with suspicion and indifference (as to his complaint about Carlson's comment); (4) Time Warner failed to punish Carlson and instead rewarded him; (5) plaintiff felt threatened by Carlson's

19

"apology"; (6) plaintiff's allegation that Time Warner blocked his attempt to transfer away from Carlson; and (7) plaintiff's eventual suspension and termination. Plf.'s Opp. at 60.

Carlson's race-based comment is no doubt objectively and subjectively offensive. Plaintiff has acknowledged, however, this was the <u>only</u> racially offensive comment he ever heard (from Carlson or anyone else) during his employment at Time Warner. A single, isolated offensive utterance is insufficient to establish a racially hostile work environment. <u>Ross v. Kansas City Power & Light Co.</u>, 293 F.3d 1041, 1051 (8th Cir. 2002).

Although Watts' alleged comments are troubling, they were made in another case and plaintiff never heard them or had knowledge of them during his employment. So the comments could not have been subjectively offensive to him during his employment or contributed to the alleged hostile work environment.

With regard to the aftermath of the Carlson investigation, the record shows that Time Warner acted quickly upon plaintiff's complaint about the incident. And Time Warner did punish Carlson – he received a verbal warning and counseling. Although Carlson did subsequently receive a pay increase, Carlson testified that every employee received an annual pay increase for cost of living so long as he or she was competent and had not been written up; there is no evidence the increase was merit-based or a "reward." Plaintiff may have been dissatisfied and frustrated with the investigation's outcome, but that does not rise to the level of an objectively hostile or abusive work environment.

Plaintiff asserts that he was threatened by Carlson's "apology," which (according to plaintiff) consisted of Carlson visiting plaintiff in the field and saying, "I thought we had a friendship. I thought we had a relationship." There is no evidence that plaintiff felt physically threatened. The court finds that a reasonable person in plaintiff's situation would not have found Carlson's

20

statements to be objectively hostile or offensive. The allegation of blocking plaintiff's attempt to transfer away from Carlson is apparently a reference to plaintiff applying for the Online Technical Supervisor position and not being interviewed or hired. Plaintiff has not claimed that the failure to promote was retaliatory, and there is no evidence to establish the link plaintiff implies.[24]

In short, viewing the evidence in the light most favorable to plaintiff, the court concludes that the conduct plaintiff cites was not so severe or pervasive as to have affected a term, condition or privilege of his employment. Therefore, plaintiff has not established a prima facie case of hostile work environment, so that claim must be dismissed.[25]

## C.    Failure to Promote (Disparate Treatment)[26]

Plaintiff has also alleged that Time Warner discriminated against him by failing to promote him to the position of Online Technical Supervisor. In the absence of direct evidence of discrimination, the McDonnell Douglas three-part burden-shifting analysis applies. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). To establish a prima facie case of failure to

---

[24]As discussed below, plaintiff has not proven that Time Warner failed to promote him based on his race.

[25]If a plaintiff demonstrates harassment by a supervisor sufficient to satisfy the prima facie case of hostile work environment, the employer is vicariously liable for the harassment unless it can establish the affirmative defense set forth in Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. Boca Raton, 524 U.S. 775 (1998). When no tangible employment action is taken, an employer can raise the affirmative defense, which requires proof by preponderance of the evidence (1) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise. See Faragher, 524 U.S. at 807. Here, because plaintiff has not established a hostile work environment, the court does not reach the issue of whether Time Warner is entitled to the Faragher/Ellerth affirmative defense.

[26]Plaintiff's complaint sets forth his failure to promote claim as a disparate treatment claim and does not allege that the failure to promote was in retaliation for engaging in protected conduct, nor has plaintiff made any such argument in his opposition brief.

promote under Title VII, a plaintiff must prove that (1) he is a member of a protected group, (2) he was qualified for and applied for a promotion to an available position, (3) he was not promoted, and (4) a similarly situated candidate, not part of the protected group, was promoted instead. Pope v. ESA Servs., Inc., 406 F.3d 1001, 1007 (8th Cir. 2005).[27] If the plaintiff establishes a prima facie case of failure to promote, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for not promoting the plaintiff. Then the plaintiff must adduce evidence to prove that the employer's stated reason is in fact a pretext for discrimination. See McDonnell Douglas, 411 U.S. at 802-04.

Although the first and third elements are undisputed, Time Warner contends that plaintiff has not satisfied the remaining elements. With regard to the second element, Time Warner argues that plaintiff has not established that he was qualified for the position of Online Technical Supervisor because he does not have a high school diploma or a GED certificate and because he had no education or experience in managing or supervising people. Qualifications of the position included a high school diploma or equivalent and electronic or cable television courses; management education or experience was not a qualification. Plaintiff notes that although he does not have a high school diploma or GED, Time Warner did not automatically disqualify his application. In addition, plaintiff had worked in the cable field for several years and had taken A+ training courses (listed as a preferred credential), as well as college courses and certain cable classes. Viewing the evidence in the light most favorable to plaintiff, it is possible that his combination of experience and coursework might be essentially equivalent to a high school diploma or GED, even

---

[27]Failure to promote claims under Title VII, Section 1981 and the MHRA are governed by the same analysis and standards. See Lidge-Myrtil v. Deere & Co., 49 F.3d 1308, 1310, 1312 (8th Cir. 1995).

though neither was ever awarded. Thus, the court finds that plaintiff has satisfied the third element of his prima facie case.

With regard to the fourth element, Time Warner argues that plaintiff cannot prove that the promotion was given to a similarly situated individual who is not a member of a protected group. Plaintiff testified that he does not know any of the ten other applicants, much less the gender, race or ethnicity of the applicants. Critically, he does not know if any of the other applicants were interviewed[28] and does not know who (if anyone) was ultimately hired for the position. Without knowing who was promoted or if a promotion even occurred, the court is unable to determine if the failure to promote plaintiff was discriminatory in nature. Because plaintiff has not satisfied the fourth element, he cannot prove his prima facie case, so his failure to promote claim must be dismissed.

Even if plaintiff could establish his prima facie case, Time Warner has proffered a legitimate, nondiscriminatory reason for not promoting plaintiff. After the position was posted, Robert Moel became President of Time Warner Kansas City in October 2002 and decided to eliminate several positions, including Online Technical Supervisor position. So no one was ever hired for that position. Thus, the burden shifts back to plaintiff to demonstrate that Time Warner's reason was merely a pretext for discrimination. Plaintiff cites a subsequent write-up being placed in his file and his eventual termination, but the court is not convinced that those things call into question Time Warner's reason, much less demonstrate pretext.

---

[28]Plaintiff testified that Steve Bennett told Mike Coleman to hold off on interviewing plaintiff. Because plaintiff has not come forth with evidence that any similarly situated applicant outside the protected group was interviewed, though, he has not demonstrated that he was treated differently than other applicants.

Case 4:04-cv-00651-HFS   Document 77   Filed 08/01/06   Page 23 of 31

D.     **Retaliation**

Finally, plaintiff has alleged that Time Warner suspended and terminated him in retaliation for his internal complaint about Carlson's comment.  Because there is no direct evidence of retaliation, the court will apply the McDonnell Douglas three-part burden-shifting analysis discussed above.  Thorn v. Amalgamated Transit Union, 305 F.3d 826, 830 (8th Cir. 2002).  To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in some form of protected activity, (2) he was subject to an adverse employment action, and (3) the adverse employment action was causally connected to the protected activity.  Sowell v. Alumina Ceramics, Inc., 251 F.3d 678, 685 (8th Cir. 2001).[29]  If the plaintiff makes out a prima facie case, the burden-shifting analysis proceeds.  The plaintiff bears the ultimate burden of persuasion throughout the analysis.

In this case, the first and second elements are easily satisfied.  First, plaintiff engaged in a protected activity when he complained to management and filed a formal internal complaint about Carlson's comment in August 2002.  Second, plaintiff's suspension and termination in December 2002 constitute adverse employment actions.  As a result, the analysis turns to the third and critical element – whether there is a causal connection between the adverse employment action and the protected activity.

Plaintiff asserts that there are several bases from which the court can conclude that the causal connection requirement has been met.  First, plaintiff argues that the short time between his complaint against Carlson and his termination satisfies this requirement.  A causal connection may be proven circumstantially "by showing the discharge followed the protected activity so closely in

---

[29]Retaliation claims under Title VII, Section 1981 and the MHRA are governed by the same analysis and standards.  See Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997); Buettner v. Arch Coal Sales, Inc., 216 F.3d 707, 713-14 (8th Cir. 2000).

time as to justify an inference of retaliatory motive." Buettner, 216 F.3d at 715-16. However, "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present an genuine factual issue on retaliation." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc).[30]

Plaintiff complained about the Carlson incident on August 21, 2002, filed his formal internal complaint on August 26, 2002, and was terminated on December 5, 2002 – a period of just over three months. In O'Bryan v. KTIV Television, the Eighth Circuit found that a three-month period between the complaint and the termination was sufficient, in and of itself, to establish a causal connection. 64 F.3d 1188, 1193-94 (8th Cir. 1995). Time Warner notes, however, that in Nelson v. J.C. Penney Co., the Circuit concluded that a one-month span between protected activity and termination failed to establish a causal connection without additional evidence. 75 F.3d 343, 346-47 (1996). Although the court does not find the three-month period between complaint and termination to be conclusive, it certainly is important evidence tending to support a causal connection.

Plaintiff next argues that a causal connection is established by the common identity of the agent investigating plaintiff's complaint and later suspending and terminating plaintiff – Baker and Bennett. In Robinson v. Potter, the Eighth Circuit found that the plaintiff had arguably established a causal link because two of the three decision-makers were aware of the plaintiff's pending complaint. __ F.3d __, 2006 WL 1889294, at *3 (8th Cir. July 11, 2006). Here, the causal link is

---

[30]That said, the Eighth Circuit has not foreclosed the possibility of proving causal connection through temporal proximity alone. See, e.g., Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002) (finding that reliance on close temporal proximity alone to establish causal connection was "consistent with the overarching philosophy of the McDonnell Douglas system of proof, which requires only a minimal showing before requiring the employer to explain its actions.").

Case 4:04-cv-00651-HFS   Document 77   Filed 08/01/06   Page 25 of 31

even stronger because Baker was actually <u>involved</u> in the investigation of plaintiff's complaint about Carlson; although Bennett was not involved in the investigation, he was aware of it, and he did move Carlson to another department based in part on plaintiff's complaint. Then, roughly three months after the complaint, Baker made the decision to suspend plaintiff, and Bennett was the decision-maker in plaintiff's termination. Further, the court agrees with plaintiff that Baker's skepticism of plaintiff's complaint about Carlson's remarks, in combination with Baker's subsequent decision to suspend plaintiff, demonstrates retaliatory motive.

Giving the benefit of all reasonable inferences to plaintiff, the court finds that the combination of temporal proximity, Baker and Bennett's involvement in (and/or knowledge of ) the Carlson investigation and in plaintiff's suspension and termination, and Baker's skepticism of

Case 4:04-cv-00651-HFS   Document 77   Filed 08/01/06   Page 26 of 31

plaintiff's complaint, is sufficient to establish a causal connection.[31]   Therefore, plaintiff has established a prima facie case of retaliation.

Continuing with the <u>McDonnell Douglas</u> analysis, the burden shifts to Time Warner to articulate a legitimate, nondiscriminatory reason for plaintiff's suspension and termination.  Time Warner claims that plaintiff violated company policies by misusing company equipment and stealing services by ordering adult-themed movies on his hot box.  On its face, this reason is legitimate and nondiscriminatory, so the burden shifts back to plaintiff to demonstrate that the stated reason is merely a pretext for discrimination and retaliation.

_____

[31]Although the causal connection element is satisfied, the court will discuss two of plaintiff's other asserted bases for causal connection, because he also asserts that they show pretext.  The court is not convinced that either basis demonstrates causal connection or pretext.
First, plaintiff points to Watts' comments about not hiring "Tamikas or Ikas" and "trash" (made in a different lawsuit) and argues that the comments demonstrate discriminatory motive given Watts' "involvement" in plaintiff's suspension and termination.  Time Warner has demonstrated that Bennett made the decision to terminate plaintiff and that he was the only person with such authority.  The evidence shows that Watts attended the meeting merely as a facilitator; she neither terminated plaintiff nor approved his termination, and she did not have the authority to do so.  Plaintiff provides no evidence or valid case law support for his assertion that Watts was a decision-maker just because she attended the meeting, took notes and later communicated the termination to plaintiff.  Plaintiff's unsubstantiated belief that she was a decision-maker is insufficient to raise factual dispute on this point.
Second, plaintiff argues that Time Warner's "ever-changing reason" for termination shows pretext.  <u>Kobrin v. Univ. of Minn.</u>, 34 F.3d 698, 703 (8th Cir. 1994) ("Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext.").  Time Warner argues – and the evidence demonstrates – that it has consistently asserted that the main reason for terminating plaintiff was that he ordered adult-themed movies on his hot box; plaintiff also testified he was told that he was terminated "for ordering X-rated movies on my hot box."  Although Time Warner's  position statement to the Kansas City Human Relations Department (Plf.'s Ex. 6) references plaintiff's failure to change the address of his free cable service (another policy violation) as an additional ground for termination, it does not back off the hot box movie ordering as the primary reason for termination.  The position statement also refers to discipline and performance issues, not as grounds for termination but to rebut plaintiff's contention to KCHRD that he had not been suspended or had any problems prior to the Carlson complaint.  Based on the evidence, the court does not find any substantial change in Time Warner's reason for terminating plaintiff.

Case 4:04-cv-00651-HFS   Document 77   Filed 08/01/06   Page 27 of 31

One way to establish pretext is to indirectly show that the employer's proffered explanation is unworthy of credence because it has no basis in fact. Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006); Erickson v. Farmland Indus., Inc., 271 F.3d 718, 727 (8th Cir. 2001). Here, plaintiff argues that there is no basis in fact for Time Warner's explanation for his suspension and termination.

Baker received the billing statement (TW Ex. BB) reflecting that one of his employees had ordered adult-themed movies through a hot box. The statement itself did not reflect which outlet or hot box had ordered the movies, so he accessed the computerized billing system for account 524817. In the computerized billing system records (TW Ex. DD), the phrase "outlets=5" appeared under each of the adult-themed movies ordered. Baker concluded that the phrase meant that the movies were ordered by outlet 5; the computerized billing system identified hot box serial number PIUA352EC with outlet 5. From there, Baker compared the serial number with the Modem/Hot Box List (TW Ex. CC) that his clerk had manually created and determined that hot box PIUA352EC was assigned to Bryon Young. Based on these conclusions, plaintiff was suspended and terminated.

Time Warner's determination that plaintiff ordered the adult-themed movies on his hot box depends on the conclusion that "outlets=5" means outlet 5. Plaintiff argues that based on his experience in interpreting billing system printouts, "outlets=5" in the computerized billing system truly means five outlets, not outlet 5 as Time Warner contends. Plaintiff's affidavit explains that when he performed disconnections, he would receive printouts with "cable data" information in substantially the same format as the computerized billing system records (TW Ex. DD). The phrase "outlets=5" indicates that at a particular residence had five outlets, or cable boxes, that needed to be collected at disconnection. In further support of his argument, plaintiff notes that the

Case 4:04-cv-00651-HFS   Document 77   Filed 08/01/06   Page 28 of 31

computerized billing system records (TW Ex. DD) show five hot box outlets, and that Modem/Hot Box List (TW Ex. CC) shows that only five employees are assigned hot box outlets under account 524817.

If "outlets=5" does not mean outlet 5, then Time Warner's reason for terminating plaintiff falls; after all, it is only with the identification of outlet 5 that Baker was able to ascertain the corresponding hot box number, then look up the hot box number on the Modem/Hot Box List and conclude that the hot box was assigned to plaintiff. The court finds that plaintiff has raised a genuine issue of material fact as to what "outlets=5" signifies.

Plaintiff also argues that the documents Time Warner relied on to terminate and suspend him are suspect. Even assuming that outlet 5 on account 524817 ordered the movies, the Modem/Hot Box List (TW Ex. CC) reflects that L. Fasani was assigned to outlet 5 on account 524817; it reflects plaintiff as being assigned to outlet 5 on account 524818. So there is at least some evidence that someone other than plaintiff ordered the movies, yet plaintiff was the only one questioned. Time Warner asserts that document contains errors in that L. Fasani actually was assigned to outlet 4 and plaintiff was actually on account 524817. It contends that the errors were insignificant because Baker relied on the computerized billing system records to ascertain the outlet and hot box numbers. So when Baker referred to the Modem/Hot Box List, he only looked for the hot box number, which was in fact assigned to plaintiff and was on the hot box he turned in.

Time Warner also argues that the proper inquiry is whether it "honestly believed" that plaintiff had ordered adult-themed movies on his hot box. Johnson v. AT&T Corp., 422 F.3d 756, 762 (8th Cir. 2005) (stating that the proper inquiry was not whether AT&T was factually correct in determining that Johnson made the bomb threats, but whether AT&T honestly believed he made the

threats). Time Warner asserts that because it held such an honest belief, even if it had no solid proof or was mistaken in its belief that plaintiff ordered the movies, "any such mistake does not automatically prove" that Time Warner was instead motivated by unlawful discrimination. <u>Johnson</u>, 422 F.3d at 762-63. In addition to discrediting the asserted reason, plaintiff must show "that the circumstances permit a reasonable inference" that the real reason for his suspension and termination was racial discrimination or retaliation. <u>See</u> <u>id.</u> at 763.

It is possible for strong evidence of a prima facie case to establish pretext as well. <u>Erickson</u>, 271 F.3d at 726. Here, the evidence of a causal connection in the prima facie case – temporal proximity, Baker and Bennett's involvement in (and/or knowledge of ) the Carlson investigation and in plaintiff's suspension and termination, and Baker's skepticism of plaintiff's complaint – goes a long way toward demonstrating a reasonable inference of discrimination or retaliation. And when combined with plaintiff's evidence raising a factual issue as to whether Time Warner's stated reason is unworthy of credence and has no basis in fact, the court finds that plaintiff has carried his burden of proving that the proffered reason was a mere pretext for discrimination and retaliation. Therefore, plaintiff is entitled to a jury trial on his retaliation claim.

## V.    Conclusion

Accordingly, it is hereby

ORDERED that plaintiff's motion to strike (ECF doc. 59) is DENIED. It is further

ORDERED that Time Warner's motion to strike (ECF doc. 66) is GRANTED IN PART and DENIED IN PART, in that the former employees' affidavits (Plf.'s Exs. 9-13) will be stricken; the motion is denied in every other respect. It is further

ORDERED that Time Warner's motion for summary judgment (ECF doc. 44) is GRANTED IN PART and DENIED IN PART.  Plaintiff's claims of pattern or practice discrimination, hostile work environment and failure to promote are hereby dismissed.  The parties should prepare for trial on plaintiff's retaliation claim.

/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

August 1, 2006

Kansas City, Missouri

Case 4:04-cv-00651-HFS   Document 77   Filed 08/01/06   Page 31 of 31